STATE OF NORTH DAKOTA, by LANGER, Governor, v. NORTH CENTRAL ASS'N OF COLLEGES AND SECONDARY SCHOOLS et al.

No. 875–D.

District Court, E. D. Illinois.

June 16, 1938.

Frank E. McAllister, of Chicago, Ill., for plaintiff.

Leonard, Meyer & Franklin, of Champaign, Ill., for defendants.

LINDLEY, District Judge.

The State of North Dakota, by William Langer, Governor, brings this suit to enjoin the North Central Association of Colleges and Secondary Schools, a voluntary association, and certain officers thereof, from removing the University and the State Agricultural College of North Dakota from its list of accredited colleges, or from interfering with or obstructing the administration, operation and maintenance of the public school system of the State of North Dakota and from counselling, conspiring, scheming and conniving with political agencies and other persons in the promulgation and exercise of any function or power which defendants may claim to possess, a discovery as to books, records, minutes, documents, correspondence and all papers of defendants and for a mandatory injunction directing the defendants to expunge, annul and avoid any order or recommendation with reference to removing the State Agricultural College of North Dakota from the list of accredited colleges.

The motion for a temporary injunction was submitted upon the verified bill of complaint, affidavits submitted by plaintiff and verified answer and affidavits submitted by defendants.

Prior to 1919, the state institutions of higher education of North Dakota were under the direction of a Board of Regents. In that year a Board of Administration was created by the Legislature and in that body was lodged the responsibility not only for the educational institutions, but for the eleemosynary and penal institutions as well. This Board directs some twenty institutions of wide variety of purpose. The Superintendent of Public Instruction and the Commissioner of Agriculture and Labor are ex officio members and constitute two of the full membership of five. Under the law all the members may be of the same political party.

The Committee on Inquiry of the North Central Association, at the latter's direction, made an investigation of the Agricultural College and its administration. The facts following were contained in its report. On July 29, 1937 the Board met in Bismarck. It voted to accept the resignations of Dr. J. H. Shepperd, President of the College, effective at once, and to dismiss the following as of August 1, 1937: A. H. Parrott, Registrar, for 33 years a member of the College Staff; R. M. Dolve, Dean of Engineering, for more than 30 years a member of the Staff; I. W. Smith, Dean of Men and Professor of Mathematics, 28 years; Alba Bales, Dean of Home Economics, 17 years; P. J. Olson, Assistant Dean of the Division of Agriculture, 12 years; Jean Traynor, Secretary to the President, 20 years; N. D. Gorman, County Agent Leader. No charges appeared of record against any of these persons. Dr. John C. West, President of the University of North Dakota, was appointed Acting President of the Agricultural College.

On July 31, 1937, the seven dismissed members received at Fargo registered letters notifying them of their dismissals but expressing no reason for the same. In lieu of the customary notice, each dismissed member was given an extra month's salary.

Dr. Shepperd on August 2 telephoned the Secretary of the Board and was promised a hearing for the dismissed staff members. Later in the day, the Secretary, it is claimed, wired Dr. Shepperd that the Board would hear him on August 3 at 11 o'clock. The Committee of inquiry in its report said that it was informed that this telegram was never received by Dr. Shepperd and that there was no record of its receipt by the Western Union Telegraph Company in Fargo, and that none of the dismissed staff members received notice of an opportunity to appear before the Board.

On July 31, 1937, the Chairman of the Board instructed the Secretary to seal the files of the President and the dismissed staff members. On August 4, 1937, the Board of Administration again convened, and thereupon Dr. West formally accepted the post of temporary President.

On August 9 the Board convened at Bismarck and wired Dr. Shepperd that it had reserved the hour of nine-thirty August 10 to hear such statements as it might be desired to make. The telegrams were sent from Bismarck at 2:20 p. m. August 9 and were received in Fargo at 2:44 p. m., too late for any of the interested parties to reach Bismarck by train in time for the hearing. This was during vacation, and there were only two members in Fargo when

the telegrams arrived, and none of the members dismissed had received any charges against him. On August 10 none of the dismissed members appeared.

In reply to the Committee's inquiry as to the cause for the dismissal of the staff members, the Board stated that no reasons had been given because of the possibility of court action by those discharged. It stated, however, that Parrott was dismissed because of his activities in adjusting hail insurance claims. The Committee secured information indicating that these outside activities were carried on only during his annual vacations. The Board reported that Dolve was dismissed because of his activities in partisan politics and the information the Committee received tended to confirm the statement that he did participate in such activities. The Board stated that Dean Smith was discharged because of incompetence due to a nervous breakdown some years earlier and improper language in one of the dormitories. The Committee found that he had had a nervous breakdown but that there was no conclusive evidence of incompetence. Miss Traynor, it was said, was dismissed because of deafness. The Committee reported that Miss Traynor had no physical handicaps or weaknesses but was efficient, competent and courteous. Dr. West recommended that she be retained, but the Board declined to accept his recommendation. Dean Bales was dismissed, according to the Board's statement, because she had cashed travel script books to the value of $180. The Committee reported that she had voluntarily repaid this amount on August 2 and that before that time it was not known that she owed the money. The Committee was of the opinion that the loose methods used in the College's accounting methods invalidated the charge of dishonesty of Miss Bales and reported that she was highly regarded by everyone and within one year of eligibility for the retirement pension. The Board stated that Dean Olson was dismissed because of his failure to act in the best interest of the farmers of North Dakota and because "he was more interested in the milling trade than in the farmers." The Committee reported that Dean Olson was efficient, independent' and perhaps not always "politic." The Committee concluded also that Mr. Gorman was without fault.

The Committee reported that it had made inquiry as to the effect, on the teaching staff, of the dismissal of the seven members; that after careful consideration of the information secured, it had concluded that the morale of the staff had been distinctly lowered; that a spirit of unrest and uncertainty existed detrimental to the program of the College; and that confirmation of this conclusion lay in the resignations of prominent staff members and the expressed desire of others to make new connections since August 1, 1937. It recommended that the College be removed from the list of accredited colleges of the North Central Association of Colleges and Secondary Schools, because (1) the evidence indicated undue interference by the Board of Administration in the internal administration of the College; (2) the morale of the faculty had declined to the point where the quality of instruction was seriously jeopardized, and (3) there was no convincing assurance that the legal structure and organization for the administration of the North Dakota Agricultural College and other institutions of higher education in the State would provide a sufficient degree of autonomy to the individual institutions to guarantee a satisfactory level of performance.

One of the members of the Board, on July 31, 1937, offered a resolution to the effect that inasmuch as the record failed to show any charge against the members of the faculty dismissed and no opportunity to them to present any defense against "this drastic action" and such action was contrary to fair procedure and sound public policy, arbitrary, unwarranted and cruel, inasmuch as those dismissed had faithfully served the State for a long period of years, the record of dismissal should be expunged and opportunity given for full and complete investigation of whatever charges might exist against the members of the staff discharged and that they be reinstated in their positions. The resolution failed of adoption.

The North Central Association of Colleges is purely voluntary in character. It includes institutions of high learning and of secondary character in twenty states of the central northwest. The several colleges and universities become members by making application and securing approval thereof by the officers of the association and continue their memberships by payment of annual membership fees. An institution may voluntarily withdraw or the Association may determine that its standards are not such that it should be retained as a member. The Association insists that all member institutions shall have a competent faculty organized for effective service, working under satisfactory conditions. Its standard in

this connection depends upon the competency of the faculty, the amount and kind of education its members have received in educational work and their scholarship, as evidenced by scholarly publications and contact with learned societies. Consideration is given to the number of the faculty in ratio to the number of students, to representation of graduates in the teaching fields, salary status, tenure, and many other elements. The Association condemns an arbitrary attitude on the part of an administration toward freedom of teaching and insists that any policy that makes tenure precarious for competent instructors is undesirable. The Association insists that it is free of every kind of partisan and political influence, calculated to affect disadvantageously the educational interests of the membership.

Under its constitution it acts largely through an executive committee. Its Commission of Higher Education has to do with the member colleges and universities. This Commission has a subcommittee, termed a Board of Review, consisting of seven members, whose duty it is to appoint inspectors, conduct inspections, receive reports and make recommendations as to members and other matters. The Board of Review reports to the Commission. The Commission in turn reports to the Executive Committee, and the final authority of the organization is its annual meeting. Appeals lie from decisions of the Commission to the Executive Committee and from the Executive Committee to the annual meeting.

The socalled accredited list is made up by the Association, according to its constitution, standards and declared purposes in this connection, in order to establish and describe the characteristics of institutions of higher education, to guide prospective students in the choice of an institution that will meet their needs; to serve as a guide to individual institutions in the transfer of students, the conduct of intercollegiate student activities, the placement of college graduates and the selection of college faculties. The Association's declared purpose is to stimulate through its accrediting practices the improvement of higher education. It states expressly that an institution will be judged for accreditment upon the basis of the total pattern its presents as an institution of higher education. It announces that superiority in some characteristic may be regarded as compensating to some extent for deficiencies in other respects. It recognizes that wide variations will appear in the degree of excellence attained.

Plaintiff insists that the action of the Association, in not renewing the membership of the Agricultural College, was arbitrary, unfair and in bad faith; that it resulted from a conspiracy amongst defendants to disgrace the educational system of North Dakota, to interfere with the state in the direction of maintenance of its educational institutions; that no fair hearing was had upon the question of whether the College should be retained as a member and that irreparable injury will be suffered by the institutions of the state unless further alleged threatened action in pursuance of the alleged plan and scheme of the Association is restrained.

The evidence shows that just prior to August 21, 1937, there appeared in "School and Society," a recognized educational periodical of wide circulation among those engaged in educational work in the United States, an article indicating that drastic changes had been made by the state authorities in North Dakota in the staff of the Agricultural College. Thereupon Dean Works, the Secretary of the Association, wrote to Dr. West, then acting president of the College, informing him of the report, stating that he was certain that the Board of Review at its next meeting would expect some report of the situation and asking whether Dr. West could supply information upon the subject matter or whether he should apply to some other source. Dr. West, on August 23, replied that he would be in position to give such information as might be required. On August 25, the Secretary again wrote to him, stating that the Board would appreciate receiving from him a statement indicating the basis upon which the members dismissed had been discharged and giving the dates upon which these persons received notice of dismissal.

On September 8, Parrott, one of those dismissed, wrote to the Secretary complaining that he and six others had been discharged and that in his opinion certain practices at the University of North Dakota should be investigated. On September 22 Dr. West replied to the Secretary's letter of August 25, saying that he was waiting to receive the State Bank Examiner's report and audit of the College before replying further, and on October 1 the Secretary again wrote Dr. West that

698

the Board would like a report from him as soon as he heard from the examiner. On November 2, Dr. West wrote the Secretary giving him a statement with regard to the dismissals, enclosing a letter from the Chairman of the Board of Administration, a clipping from the Fargo Forum and saying that the Board refused to make public its charges against the dismissed members on the ground that they might be held personally responsible. On November 23, Dean Works wrote President West that he would submit his letter and accompanying documents to the Board. He said that the Association recognized the fact that any state is free to direct its educational institutions as it pleases but that the Association, as a voluntary organization, reserved the right to determine whether a member of the Association is doing violence to the educational interests of students through making appointments to its staff on a political basis.

Later President West sent to Dean Works a special audit and examination of the Agricultural College prepared by the state examiner, a document covering some 323 pages, largely concerned with statistics and with alleged correspondence and activities of Dean Dolve and Mr. Walser. On January 11, 1938, Dean Works wrote Dr. West that it was planned to have a meeting of the Board of Review on January 21 and asked if he could be present at that meeting or on the following morning. On the same day Dr. West had written Dean Works that he could come to Chicago at almost any time and thought a conference desirable.

On January 20 and 21 the Board of Review held its meeting and Dr. West attended. There was some discussion concerning the College and it was suggested that a committee of three go to North Dakota and assemble the facts. President West agreed to ascertain whether this proposed action would be agreeable to the State Board and to advise the Board of Review. On February 9 he wrote Dean Works that the College would be pleased to receive the Committee and, on March 10, the Committee, composed of President Friley of Iowa State Agricultural College, President Barrows of Lawrence College, and Dean Brumbaugh of the University of Chicago, proceeded to Fargo. Dr. West informed them that the State Board was ready to receive and confer with them and the meeting was held immediately, there

being present the members of the committee, the members of the State Board and President West.

The greater portion of the day was consumed in the conference. The defendants offer evidence that they conferred or counseled with no politicians or representatives of any newspaper; that they made no statements to any publication; that they made examination of the files of papers previously published but that no member talked to the editor, reporters or other representatives of any paper. The Committee interviewed some of the members of the faculty and read the minutes of proceedings of the Board of Administration covering a period of years.

As a result of the information, obtained in their investigation and the conference, the Committee made the findings hereinbefore mentioned. The written report was filed with the Board of Review. Dean Works wrote President West that the Board of Review would like to discuss it with him on April 5. Dean Works said that he did not know what the report contained as he had not seen it but that he would endeavor to advise President West prior to the hearing. On March 26, the Assistant to President West wrote that the latter had been ill and could not be present on April 5. Dean Works replied that in case President West was not able to come, the Board of Review would receive any one or more persons designated by Dr. West.

On April 3, 4, 5 the Board met and President West as well as Commissioner Hagan, Ex Officio member of the Board of Administration and Mr. Gunvaldsen, from the College Alumni, attended. The report of the Committee of Inquiry was read and discussed and at the conclusion the Board adopted minutes showing that the report had been submitted, a conference held with the gentlemen mentioned; that it was recommended to the Commission that the Agricultural College be removed from the accredited list and that the Board complete the action suggested. The recommendations were approved unanimously by the Commission on Institutions of Higher Education.

On April 8, 1938, President West wrote Dean Works asking that an Advisory Committee be appointed to recheck the conditions at the Agricultural College and that his letter be considered a petition for reinstatement. Dean Works

replied that he would be glad to put the request before the Board of Review, but that the application for reinstatement could not be made at that time. He stated that the Executive Committee, under the Constitution had authority to hear and determine appeals from the findings of the Commissions on the approval of schools. Neither the College nor any other party saw fit to appeal or to avail itself of the opportunity to have a review of the findings by the Executive Committee.

The affidavits submitted include averments that the Association has acted only in accordance with its Constitution, rules and regulations of procedure; that it has been guided only by a desire to carry out the purposes of its organization; that it has no interest in any partisan or political controversy existing in the state of North Dakota and has listened to none of the parties to such controversy; that it has based its conclusion solely upon the information obtained at the conferences with President West and the Board of Administration and personal conversations with members of the staff at the College, as hereinbefore set forth.

The Association insists that the court is without jurisdiction, first, because the controversy is one solely between members of voluntary organizations, over whose actions the court has no jurisdiction; second, because the College's remedy under the constitution and rules of procedure of the Association must be exhausted before there is any remedy in any court, and that upon the merits, its action should be approved.

At the threshold the court is confronted with the additional suggestion that diversity of citizenship does not exist, as two of the members of the North Central Association are residents of the state of North Dakota. However, I am not impressed with the soundness of this contention. The officers of the Association made parties defendant reside in states other than North Dakota, the President being in Illinois. The members of the Association are not made parties defendant; nor can it be contended that they are indispensible parties. Full and adequate relief could be granted to the plaintiff without their presence and an injunction against the officers of the Association would effectually protect the plaintiff. Inasmuch as all of such parties are of citizenship diverse to that of the plaintiff, I conclude that the court has jurisdiction on the ground of diversity of citizenship.

Upon the contention that the court has no jurisdiction to interfere, a different question is presented. Voluntary associations have the right to make their own regulations as to admission or expulsion of members and one who becomes a member, by its membership, assents to the Constitution and rules of procedure adopted by such an association. The Constitution, by-laws and rules, knowingly assented to, become in effect a civil contract between the parties, whereby their rights are fixed and measured. Consequently, in the absence of fraud, collusion, arbitrariness or breach of contract, such as give rise to a civil action, the decisions of such voluntary associations must be accepted in litigation before the court as conclusive, for the members of the organization have made them binding by contract.

Thus in Gonzalez v. Archbishop, 280 U.S. 1, 16, 50 S.Ct. 5, 7, 74 L.Ed. 131, the court said: "In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise. Under like circumstances, effect is given in the courts to the determinations of the judicatory bodies established by clubs and civil associations."

In churches, lodges and all other like voluntary associations each person, on becoming a member, either by express stipulation or by implication, agrees to abide by all rules and regulations adopted by the organization, and courts will not interfere to control the enforcement of by-laws of such associations but will leave them free to enforce their own rules and regulations by such means and with such penalties as they may see proper to adopt for their own government. Engel v. Walsh, 258 Ill. 98, 103, 101 N.E. 222, 45 L.R.A.,N.S., 353; Bostedo v. Board of Trade, 227 Ill. 90, 81 N.E. 42; Harris v. Missouri P. R. Co., D. C., 1 F.Supp. 946; Elfer v. Marine Engineers Association, 179 La. 383, 154 So. 32. Consequently such an organization is the judge of its own members, and membership therein is a privilege which may be accorded or withheld and not a right which can be gained independently and enforced. In the absence of breach of

the law a chancellor is powerless to compel admission by or into such an Association and if one's application is refused, it is equally without power to grant relief. 4 Am.Jur. 462, paragraph 11; American Livestock Comm. Co. v. Chicago Exchange, 143 Ill. 210, 32 N.E. 274, 18 L.R.A. 190, 36 Am.St.Rep. 385. The rules laid down for the government of the members of an association form the measure of their rights in the premises; it is vain to appeal to a constitutional bill of rights, for such bills of rights are intended to protect the citizen against oppression by the government, not to afford protection against one's own agreements. 4 Am.Jur. 463.

It appears that the remedies of the College before the Board under the rules of the Association were not exhausted. It had a right to appeal and have full review by the Executive Committee. This remedy it has never sought to attain. Courts will not take jurisdiction over controversies between voluntary associations and their members until the latter have exhausted all remedies provided within the Associations. Harris v. Missouri P. R. Co., D. C., 1 F. Supp. 946, at page 950; Engel v. Walsh, 258 Ill. 98, 101 N.E. 222, 45 L.R.A.,N.S., 353; Moody v. Farrington, 227 Ill.App. 40; Crisler v. Crum, 115 Neb. 375, 213 N.W. 366; Elfer v. Marine Engineers Association, 179 La. 383, 390, 154 So. 32.

The evidence discloses no violation of civil rights but merely a decision by the Association that the College is not eligible to membership. There is no evidence to sustain the contention that this decision was arrived at arbitrarily and without substantial evidence to support it. Indeed, the absence of appeal by the College speaks loudly against any contention of such arbitrary action. It does not follow that the state is interested in any way except as representative of the College and the sovereignty supporting it. The State has no greater rights than the College itself has.

What has been said applies with equal force to the allegation that the Association threatens to remove the University of North Dakota from the accredited list. There is no evidence of such threat. Quite the contrary seems to be the situation. But if such action should be taken by the Association, the remedy of the University and of those responsible for its welfare lies within the Constitution and rules of procedure of the Association, which the University has voluntarily assented to. It has a right to be heard and a right to review, and until the day of exhaustion of remedies within the Association, this court has no right to interfere. Upon the conclusion of any future action by the Association the result will disclose whether there has been any breach of the law which would justify a court of equity's interference.

Accordingly the motion for temporary injunction will be denied and the temporary restraining order dissolved.

In reaching my conclusions, I have considered only the original briefs. The reply brief of defendants is subject to criticism, and plaintiff has made a fervent attack upon it. Rather than permit any inference that I have been influenced by anything therein contained, I have studiously ignored all its contents.

The foregoing includes and is adopted as my findings of fact and conclusions of law.